IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2026

## STATE OF TENNESSEE v. GREGORY KEONTAE LYONS

**Appeal from the Circuit Court for Rutherford County**
No. 86811-B    James A. Turner, Judge
_____

**No. M2025-00230-CCA-R3-CD**
_____

Defendant, Gregory Keontae Lyons, appeals from his convictions for first-degree premeditated murder; employing a firearm during the attempt to commit a dangerous felony; attempted sale of a Schedule I controlled substance; and conspiracy to sell a Schedule I controlled substance, for which he is serving an effective sentence of life plus twelve years. On appeal, Defendant contends that the evidence is insufficient to support his convictions; that the trial court erred by granting the State's motion in limine to exclude references to his age; and that the trial court failed to properly consider Defendant's age as a mitigating factor in sentencing. After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and STEVEN W. SWORD, JJ., joined.

Bradley A. Stephens (on appeal) and R. Wilford Fraley, III (at trial), Murfreesboro, Tennessee, for the appellant, Gregory Keontae Lyons.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew W. Westmoreland and Trevor H. Lynch, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

This case arises from the September 27, 2020 shooting death of Javarius Malone ("the victim") during a heroin transaction. Defendant was seventeen years old at the time. The February 2022 term of the Rutherford County Grand Jury issued an indictment

charging Defendant and Corey Munsell Lillard, Jr.[1] ("co-defendant Lillard"), with first-degree premeditated murder; employing a firearm during the attempted commission of a dangerous felony, to wit: the sale of heroin, a Schedule I controlled substance; attempted sale of heroin, a Schedule I controlled substance; and conspiracy to sell heroin, a Schedule I controlled substance. *See* Tenn. Code Ann. §§ 39-12-103, -13-202, -17-417, -17-1324. Co-defendant Lillard was tried separately.

### A. Pretrial motion in limine

The State filed a pretrial motion in limine seeking to prohibit defense counsel from referring to Defendant as a "child, kid, boy, minor, juvenile" or mentioning his Department of Children's Services (DCS) supervision, juvenile court involvement, or high school status. The State argued that Defendant's age was irrelevant under Tennessee Rules of Evidence 401, 402, and 403 and would serve only to elicit jury sympathy.

Defense counsel responded that Defendant's age could cut against him because the jury "might" be more upset that the alleged act was committed by a juvenile. Counsel added,

> I don't know how this plays out or how I would bring this into the case. But the fact is he was under the age of 18. And I might refer to him as a young man, a kid . . . Maybe juvenile. But I don't see that that has any prejudicial effect on the jury.

Defense counsel also distinguished the State's cited case.

The trial court found Defendant's minor status irrelevant and potentially distracting. It granted the motion as to "child, boy, minor, [and] juvenile[,]" but allowed "young man" and indicated it would be less strict about "kid."

### B. Trial

Murfreesboro Police Department (MPD) Emergency Communications dispatcher Tiffany Matthews testified that, at 11:21 p.m. on September 27, 2020, she received a call from a woman at an address on Gunnerson Avenue reporting a shooting.

---

[1] The record reflects that co-defendant Lillard pleaded guilty in 2023 to facilitation of first-degree murder and attempted possession of a Schedule I controlled substance, for which he received an effective twenty-year sentence.

The recorded 911 call was entered as an exhibit and played for the jury. In the recording, a woman who identified herself as "Sherry" recounted that she "heard a sound" outside her home, opened her door, heard someone say, "I've been shot, help," and found a man lying on the ground. Sherry stated that the man had been shot in the chest and that he was still breathing.

MPD Sergeant Jonathan Pope and Officer Trae Smalley testified that they separately responded to the shooting call on Gunnerson Avenue and that, when they arrived, they saw the victim lying on his back in a cul-de-sac near several small duplexes. Sergeant Pope stated that the victim had a gunshot wound to the chest with no exit wound, that he was "gasping for air pretty hard," and that his eyes were "discolored." After clearing the area, Sergeant Pope attended to the victim, and Officer Smalley took initial photographs of the scene.

The photographs were received as exhibits and showed Sergeant Pope kneeling over the victim and pressing a grey item of clothing onto his chest. Some blood was visible on the clothing and the pavement. A bicycle was on the ground just behind Sergeant Pope.

MPD crime scene investigator Katie Iyoob testified that she processed the shooting scene. She identified a diagram of the scene and several photographs, which were received as exhibits and reflected that, in addition to the bicycle, a white lighter, red flashlight, and gray sweatshirt were in the area immediately around the victim. A cartridge casing was slightly further away to the victim's left, and a small bundle of folded money was to the victim's right. Officer Iyoob stated that the money consisted of two twenty-dollar bills and two five-dollar bills. Officer Iyoob said that she collected DNA swabs from the bicycle's handlebars and dusted them for fingerprints; she noted that the fingerprint testing was inconclusive. She also collected DNA swabs from the white lighter.

MPD crime scene investigator Regan Edwards testified that she collected evidence from co-defendant Lillard's house pursuant to a search warrant. Officer Edwards identified a photograph she took of a .357 caliber Glock magazine found in the kitchen. Officer Edwards dusted the magazine for fingerprints, but none were found. Officer Edwards collected DNA swabs from the magazine.

Tennessee Bureau of Investigation (TBI) Special Agent Savannah Houk, an expert in firearm and toolmark examination, testified that she tested the shell casing, bullet, and bullet fragments collected in this case. She stated that the bullet was a ".38 caliber class" that could have been manufactured by several companies, including Glock, Kahr, Heckler & Koch, and others. Agent Houk said that Glock was the most common brand. Agent Houk stated that the .38 caliber class included "9 millimeter, a .357 SIG, .38 Special, a .357 Magnum, [and] .380 Auto." Agent Houk noted that the bullet fragments were of no comparison value and that no firearm was submitted to her for comparison.

Agent Houk testified that the ".357 SIG" cartridge casing collected at the shooting scene had "class characteristics . . . consistent with that of older model Glock style firearms." Agent Houk stated that it was possible for her to test a gun magazine; she noted, though, "with only one cartridge case, it would be kind of hard to establish reproducibility of a magazine." Agent Houk said that most magazines are designed for a specific caliber of bullet and firearm and that multiple manufacturers made Glock magazines.

On cross-examination, Agent Houk acknowledged that she could not identify with certainty which brand of firearm fired the bullet recovered from the victim.

Matthew Davenport testified that, in August 2020, he had recently moved to Tennessee from Massachusetts and worked as a maintenance supervisor at Middle Tennessee State University (MTSU), where he was the victim's manager. Mr. Davenport said that his shift began at 10:00 p.m. and that the victim's shift began at 11:00 p.m. Mr. Davenport stated that, three days after he met the victim, he noticed the victim's "nodding off in the elevator" and asked the victim if he could supply Mr. Davenport with drugs. Mr. Davenport said that he gave the victim money and that the victim would leave campus, buy heroin, and bring it back to him.

Mr. Davenport testified that, on September 27, 2020, he texted the victim throughout the day and that, before work, he gave the victim fifty dollars with which to buy drugs—two twenty-dollar bills and two five-dollar bills. Mr. Davenport noted that he and the victim reported to work as usual, that the victim received a phone call, and that, around 11:15 p.m., he realized the victim had left. Mr. Davenport did not see the victim again, and he later learned that the victim had been shot. Mr. Davenport spoke to the police and told them that he "was probably responsible" because the victim had been buying drugs for him.

On cross-examination, Mr. Davenport testified that he recognized that the victim was intoxicated at work because of his own experience with drugs. Mr. Davenport stated that he paid the victim to obtain heroin for him five or six times in the three weeks they knew one another. Mr. Davenport did not know from where the victim obtained it.

Dr. Emily Dennison, an expert in forensic pathology, testified that she performed the victim's autopsy. She determined that the cause of death was a gunshot wound to the chest and that the manner of death was homicide. Dr. Dennison stated that the bullet entered the right side of the chest between two of the victim's ribs; passed through the right lung, another rib, and the thoracic vertebrae; and severed the spinal cord. Dr. Dennison noted that forty percent of the victim's blood volume was in his chest cavity. She recovered a bullet from his back and bullet fragments from his spine.

Dr. Dennison testified that the spinal cord injury was "immediately incapacitating," although she noted that the victim survived until after he reached the hospital. She agreed that additional, minor injuries, like a knee abrasion and a small laceration to the right ear, could have occurred when the victim fell.

On cross-examination, Dr. Dennison testified that the victim's toxicology testing was positive for morphine; "6-monoacetylmorphine," an active metabolite of morphine, "[m]ost notably . . . seen in heroin[] use"; fentanyl; and norfentanyl, a metabolite of fentanyl. Dr. Dennison stated that she could not determine when the victim suffered the minor injuries; she noted, though, that they were "acute" and "fairly recent." She stated that some of the injuries and rib fractures could possibly have resulted from CPR. Dr. Dennison said that no soot or stippling was present around the gunshot entry wound, which indicated that the shot was fired from more than two feet away or that an object was between the victim and the gun.

TBI Special Agent Carrie Schmittgen, an expert in forensic biology, testified that she performed DNA testing on swabs from the white lighter, two bicycles, and a gun magazine and compared them to DNA samples collected from the victim, Defendant, and co-defendant Lillard. Swabs from the "lighter wheel" contained at least three profiles; the major contributor matched the victim. Swabs from the right and left handlebars of the first bicycle contained four profiles, at least one of which was male; the major contributor was Defendant, and the "probability of randomly selecting an unrelated individual who would be included as a contributor to this DNA profile is one in a number greater than the current world populations for the African American, Caucasian, and southwestern Hispanic populations[.]" The swabs from the second bicycle did not contain a sufficient amount of DNA to develop a profile. The swab from the gun magazine contained at least three DNA profiles, including at least one male; the major contributor profile was "an unknown female," and the minor contributors were inconclusive for comparison.

The parties entered the following stipulation:

> [H]ad Ms. Lisa Earls been called to testify, Ms. Earls would have testified that as a result of an order, [Defendant] was on a global positioning system, GPS monitoring. This monitoring was for a period that included the month of September 2020. Ms. Earls would further testify that in the ordinary course of business, these GPS records were maintained by Securus Monitoring Solutions. Ms. Earls would testify that she obtained these records from Securus along with a verification of authenticity from custodian of the records[.]

MPD Detective Cody Thomas, an expert in digital forensics and forensic mapping, testified that he examined cell phone records from the victim, co-defendant Lillard, and

Defendant; location data from Defendant's GPS ankle monitor; and surveillance recordings from the area around the shooting scene, which included MTSU buildings, an apartment complex, and Gentleman Jim's bar on Gunnerson Avenue. Detective Thomas testified that one of co-defendant Lillard's known nicknames was "CM Youngin" and that co-defendant Lillard's telephone number was labeled as "Youngin" in Defendant's cell phone and "Younging CM" in the victim's cell phone.

Detective Thomas testified that he used a computer program to make maps documenting Defendant's and co-defendant Lillard's locations throughout the evening and images recreating text message conversations using a familiar "chat bubbles" format. The maps and text message images were entered as exhibits and shown to the jury.

The exhibits established the following events on the night of the shooting: Defendant's ankle monitor was at his home from 9:51 p.m. until 9:57 p.m. At 9:58 p.m., co-defendant Lillard's cell phone "pinged" the north side of a cell tower that was close to the shooting scene; co-defendant Lillard and Defendant both lived north of the cell tower on different streets.

Beginning at 10:03 p.m., Defendant and co-defendant Lillard had a text message conversation in which Defendant asked co-defendant Lillard if he was at home and stated that he was about to come to co-defendant Lillard's house. Co-defendant Lillard responded, "Hurry because I've got something going." Defendant's ankle monitor left his house at 10:04 p.m. and traveled to co-defendant Lillard's house, arriving at 10:09 p.m. At 10:10 p.m., Defendant texted co-defendant Lillard asking him to open the door. Defendant's ankle monitor remained at co-defendant Lillard's house until 11:04 p.m.

At 10:38 p.m., the victim texted co-defendant Lillard, and the following conversation occurred:

| Author | Recipient | Text[2] |
|---|---|---|
| The victim | Co-defendant Lillard | Yo. You good? |
| Co-defendant Lillard | The victim | Yeah |
| The victim | Co-defendant Lillard | What color is it? |

---

[2] The original text messages contained abbreviations, slang, and spelling and typographical errors such that they were difficult to read. We have chosen to use the version of the messages in the trial transcript when Detective Thomas read them aloud. Our review of the record reflects that he accurately articulated the messages' meaning.

| The victim | Co-defendant Lillard | I got bite[3] for half and if it's not some BS . . . they spend 100 right after but how long it take you to get here? I got [to] be back at work at 11:00 |
|---|---|---|
| Co-defendant Lillard | The victim | They need it now? |
| The victim | Co-defendant Lillard | Yeah |
| Co-defendant Lillard | The victim | They down there . . . right now with the cash[?] |
| The victim | Co-defendant Lillard | Yeah |
| Co-defendant Lillard | The victim | Because I ain't got time to be playing |
| Co-defendant Lillard | The victim | I need 45 for the half .6 for 50 |
| The victim | Co-defendant Lillard | They got 50 and I don't got time to be waiting on some s--t that ain't dope |
| Co-defendant Lillard | The victim | Talk in code |
| Co-defendant Lillard | The victim | Why you saying them kind of words on text messages? |
| The victim | Co-defendant Lillard | You just said .5, .6. You ain't talking in code. |
| Co-defendant Lillard | The victim | That ain't saying nothing. |
| Co-defendant Lillard | The victim | The word "dope" is popular, Fam |
| Co-defendant Lillard | The victim | You can't be saying that s--t through text |
| The victim | Co-defendant Lillard | I'm the one [who] said dope and I know it's popular. You [are] the one [who] said other stuff |
| Co-defendant Lillard | The victim | All right. I'm on the way. You want it[?] |
| The victim | Co-defendant Lillard | Yeah. Don't bring no bulls--t |
| Co-defendant Lillard | The victim | All right. I'm fixing to be there. |
| The victim | Co-defendant Lillard | Ok |
| Co-defendant Lillard | The victim | [O]n the way. |

---

[3] Detective Thomas testified that "bite" is slang meaning, "I'm acting as a middleman. I've got somebody else I'm purchasing drugs for."

| The victim | Co-defendant Lillard | Ok |

A surveillance camera near the MTSU maintenance building showed the victim walking around a corner and down the street toward MTSU at 10:42 p.m. The victim was using his cell phone as he walked.

From 11:04 p.m. until 11:07 p.m., Defendant's ankle monitor traveled from co-defendant Lillard's house, down Gunnerson Avenue, and across an apartment complex parking lot before arriving at the shooting scene. Surveillance cameras from the apartment complex showed two people traveling across the complex on bicycles between 11:04 p.m. and 11:05 p.m.; one person wore a dark-colored hoodie with the hood raised, and the other wore a lighter-colored hoodie. Detective Thomas identified the person wearing the lighter-colored hoodie as Defendant.

At 11:07 p.m., co-defendant Lillard called the victim; the call lasted one minute, eighteen seconds, and co-defendant Lillard's phone pinged the southwest side of the cell tower, which included the area of the shooting scene.

Defendant's ankle monitor traveled past the shooting scene and down Gunnerson Avenue between 11:09 p.m. and 11:12 p.m. It traveled back up Gunnerson Avenue between 11:12 and 11:14 p.m. Surveillance cameras at MTSU and Gentleman Jim's bar showed two people on bicycles passing the bar, looping around at a stop sign, and pedaling back up Gunnerson Avenue.

Co-defendant Lillard and the victim exchanged more text messages beginning at 11:10 p.m. Co-defendant Lillard asked the victim if he was coming; the victim responded with his location and stated that he was hurrying.

The MTSU surveillance camera showed the victim jogging away from campus on foot at 11:12 p.m. Another surveillance camera near Gentleman Jim's bar showed the victim walking through the area toward the shooting scene at 11:13 p.m.

Defendant's ankle monitor was at the shooting scene from 11:14 p.m. until 11:19 p.m. At 11:16 p.m., the victim called co-defendant Lillard for fifteen seconds. Co-defendant Lillard's cell phone again pinged the southwest side of the cell tower.

At 11:19 p.m., Defendant's ankle monitor traveled north from the shooting scene to a house on Middleborough Court. Detective Thomas stated that the ankle monitor's location was updated once per minute and that the rate at which the ankle monitor left the shooting scene and arrived at Middleborough Court indicated that Defendant was running. The apartment complex's surveillance cameras showed the bicyclists emerging on foot

from the woodline and running in the direction from which they traveled earlier. Detective Thomas stated that the Middleborough Court home belonged to Jackie Brinkley, who was a relative of Defendant or co-defendant Lillard.

Detective Thomas testified that the lack of electronic communication between Defendant and co-defendant Lillard during the evening indicated that they were likely together. He stated that Defendant remained at Ms. Brinkley's house until 12:30 a.m. and returned to his house at 12:37 a.m. Co-defendant Lillard's cell phone made a call at 11:40 p.m. and pinged the north side of the cell tower, which included both the Middleborough Court house and co-defendant Lillard's house.

Detective Thomas testified that, after the shooting, the police performed a tracking search with a police dog, which took them to Middleborough Court; he noted that the street was "littered with police cars for quite a while[.]"

Beginning at 12:33 a.m., Defendant and co-defendant Lillard had a text message conversation referencing the police presence in the area. Defendant noted that officers were not watching "Jackie['s] house" or "where [Defendant and co-defendant Lillard] were." Defendant remarked that officers were "watching toward the entrance but maybe they [were] trying to do that to throw us off." Co-defendant Lillard warned Defendant, "Don't text nothing about it." Defendant told co-defendant Lillard that he was "up like a MF," that he was going to get marijuana from his neighbor, and that he would need "ski"[4] to sleep.

At 3:10 a.m., co-defendant Lillard called Defendant for ten seconds. At 3:11 a.m., their text conversation continued as follows:

| Author | Recipient | Text |
| --- | --- | --- |
| Defendant | Co-defendant Lillard | You straight |
| Defendant | Co-defendant Lillard | ? |
| Co-defendant Lillard | Defendant | Nvm ["never mind"] |
| Co-defendant Lillard | Defendant | Love u, Cuz. GN ["good night"] |
| Co-defendant Lillard | Defendant | Just know this s--t 4E ["forever"]. Never [bend], break, or fold. |
| Defendant | Co-defendant Lillard | ["Love" react to message] |

---

[4] Detective Thomas testified that "ski," spelled "skee" in the original text message, was a slang term meaning "drugs in some capacity."

Detective Thomas testified that he interviewed Defendant at the police department on October 3, 2020. Defendant stated that the victim, whom he called "Var" or "Vari," was his cousin. Defendant repeatedly asserted that he had nothing to do with the shooting and that he would not hurt a family member.

When confronted with his ankle monitor data, Defendant acknowledged that he was present at the shooting scene and later added that he was with another cousin he initially refused to name but eventually identified as "Corey." Defendant stated that co-defendant Lillard had no conflict with the victim. Defendant said that he had known co-defendant Lillard his entire life and that the only reason Defendant was speaking to the police was to protect co-defendant Lillard and himself.

Defendant stated that he and co-defendant Lillard were in the area of the shooting to buy marijuana from a cousin who lived nearby, whom he eventually identified as "Deebo" or "De'Brian." He stated that De'Brian lived in an apartment behind Tom Pugh's house; the victim and a bicycle were found in front of Mr. Pugh's house.

When Detective Thomas asked Defendant for De'Brian's contact information, Defendant interjected that, after he left the shooting scene, he went to a female cousin's house on Middleborough Court to have his hair done and that she would vouch for him. Detective Thomas commented that he was sure "Jackie" would lie to him, and Defendant responded that the cousin was not Jackie. An officer later entered and drew a diagram of the area, and Defendant pointed out and described where De'Brian lived.

Defendant identified his bicycle in a still photograph from the apartment complex surveillance recordings. When shown a spreadsheet with the victim's text messages, Defendant denied knowing anything about them. Defendant denied that his or co-defendant Lillard's DNA would be found on the shell casing from the shooting scene.

Defendant recited several versions of what happened that evening. Defendant first stated that he only heard gunshots and ran away. Defendant then averred that he was in the area to get marijuana and that, after obtaining it, he heard someone say, "Come here." Defendant said that he walked toward the unknown person and heard gunshots. Defendant denied knowing who the shooter was. Defendant stated that he fled the scene because he did not want to get shot. Defendant stated that both he and co-defendant Lillard dropped their bicycles and ran. Defendant denied knowing the victim was there. Defendant said that he went to a cousin's house and that Defendant's brother picked him up there.

Defendant next asserted that he came out of an unidentified building after buying marijuana; that he heard someone say, "Hey, come here real quick"; that he asked the person what was up; that he could not see because it was dark; that he heard "pow pow

pow"; and that he saw two people. Defendant maintained that neither he nor co-defendant Lillard shot the victim.

Defendant added that co-defendant Lillard went upstairs with him to get marijuana and that, upon exiting, a person with a black jacket and a black hat beckoned to them. Upon further questioning, Defendant said that the person's nickname was "TQ."

Defendant said that, before going upstairs to get the marijuana, he left his bicycle in front of Mr. Pugh's house. Defendant denied knowing about co-defendant Lillard's arrangement to sell the victim heroin.

When asked why Mr. Pugh told the police that Defendant and co-defendant Lillard killed the victim, Defendant responded that he had not spoken with Mr. Pugh in two months. Defendant repeated that he did not see the victim that night. Defendant said that he and co-defendant Lillard left their bicycles in the "apartments back there."

Defendant stated that he had lied about De'Brian's address and that he did not live there anymore. Defendant said, though, that he still often met De'Brian behind the building where he used to live. Defendant stated that, on the night of the shooting, he went behind the building, saw that De'Brian was not there, and called him on Snapchat. According to Defendant, De'Brian said that he was nearby and would come to him. Defendant stated that he saw the victim talking to TQ, who walked away. Defendant said that he greeted the victim and that they conversed briefly before "he" walked out and shot the victim. Defendant agreed that he saw the victim get shot. Defendant maintained that co-defendant Lillard was with him the entire time. When asked why he did not contact the police in the week between the shooting and Defendant's arrest, Defendant did not directly answer but maintained that he was telling Detective Thomas everything he knew and was being truthful.

Detective Thomas told Defendant that co-defendant Lillard had denied being with him on the night of the shooting and told the police that he had been at home all night. Defendant maintained that he had nothing to do "with any guns" and denied that he or co-defendant Lillard killed the victim. Defendant repeated that he knew nothing about a heroin sale.

Detective Thomas testified that the surveillance recordings showed that Defendant's bicycle had one reflector on the front wheel; the second bicycle had reflectors on both wheels. Detective Thomas stated that the bicycle found near the victim had only one reflector on the front wheel and contained Defendant's DNA. Detective Thomas said that, later in the morning on September 28, officers found a second bicycle in the woodline between the shooting scene and the apartment complex. He stated that the DNA testing of

the second bicycle was inconclusive, and he noted that it had rained by the time officers found it.

Detective Thomas testified that he collected Defendant's cell phone at the interview and, after obtaining a search warrant, performed a limited data extraction several days later. Detective Thomas said that, at 8:27 p.m. on September 28, 2020, the phone accessed a news article with the headline, "Victim of Murfreesboro Sunday Night Homicide Identified"; a screenshot of the article included one of the crime scene photographs.

Detective Thomas testified that he used the cell phone number Defendant provided during the interview to search for communications between Defendant and the victim in the victim's cell phone. Detective Thomas said that records related to voice calls were present on both Defendant's and the victim's cell phones; however, their text messages were only present on the victim's phone. Detective Thomas stated that this was a "likely indicator" that the text messages had been deleted from Defendant's phone. Detective Thomas noted that Defendant's nickname was "K Money."

On June 1, 2020, the victim and Defendant had the following text conversation:

| Author | Recipient | Text |
| --- | --- | --- |
| The victim | Defendant | Is this K Money? |
| Defendant | The victim | Yeah |
| The victim | Defendant | This cousin stay[] by Tom |
| Defendant | The victim | What's up? |
| The victim | Defendant | What you want for half? |
| Defendant | The victim | 50 |
| The victim | Defendant | All right. Hit you back in a minute |
| Defendant | The victim | I'll do 40, though |
| The victim | Defendant | All right |
| Defendant | The victim | Hey. Got you for fifty now. |
| The victim | Defendant | Waiting on my bite, Fam |

On June 2, 2020, the victim reached out to Defendant by text again. The victim asked if Defendant would let him "hold [a] couple points" until he was paid on Friday. Detective Thomas testified that holding a point was slang for, "[W]ill you front me drugs without me paying you right now[?]" Defendant responded, "I'll give you half if you can give me 50 when you get paid." Defendant noted that he did not like "doing fronts" because

- 12 -

two people "got over on" him previously, and the victim assured him that he would pay. Defendant instructed the victim to come to his house and call him when he was at Defendant's bedroom window.

The conversation continued on June 3, 2020:

| Author | Recipient | Text |
|---|---|---|
| The victim | Defendant | Hey, Bro. Someone is supposed to bring me that money tonight. I front it to them and I got bite tonight. |
| Defendant | The victim | All right. Bet |
| The victim | Defendant | Let me hold point. I owe you 60 and that's limit |
| Defendant | The victim | All right. Ho[ld] up |
| The victim | Defendant | All right |
| Defendant | The victim | All right. I'll . . . let you know |
| The victim | Defendant | It's going to be a minute. Trying to get before I go over to my granny. My granddad die |
| Defendant | The victim | All right. Say no more |
| The victim | Defendant | Bet |
| The victim | Defendant | Can you get some hard and how much G? Can I walk . . . down there and get that? |

On June 4, Defendant texted the victim asking if he would have the $50 for him tomorrow. The victim stated that a man was bringing it to him when he got off work. On June 5, the victim texted Defendant, "He get at 6:00. Soon as he come, I'm going to call you." The next communication occurred on the evening of June 12, when the victim texted Defendant, "Bro, ain't forgot about you. I get paid Wednesday and I got you."

Over the following weeks, the text conversation continued:

| Date | Author | Recipient | Text |
|---|---|---|---|
| June 14 | Defendant | The victim | Have you talked to Tom? |
| June 17 | The victim | Defendant | You up, Bro? |

| | | | |
|---|---|---|---|
| | Defendant | The victim | Yeah |
| June 30 | Defendant | The victim | Hey. What's up with that? |
| July 1 | The victim | Defendant | Where you at? |
| | Defendant | The victim | Zaxby's. Fixing to go to the crib when I leave here. |
| | The victim | Defendant | All right. I was in the hospital yesterday[,] why I didn't answer but I got to do some stuff when I get home. I'm going to text you. If not tonight, it be tomorrow when I get off. I get it though |
| | Defendant | The victim | All right, Fam |
| July 10 | Defendant | The victim | This K Money. Can I come get that today? So when you want to come pick that bread [up] |
| | The victim | Defendant | I got you. I couldn't answer. My boss was around me. I get off at 6:00 p.m. but give me time to get home and make sure you answer phone because I be falling asleep soon as I get home |

Detective Thomas testified that at 8:26 p.m. and 8:36 p.m. on July 11, Defendant called the victim, but he did not answer. About an hour later, Defendant texted the victim, "Hey. What's up with that?" The victim did not answer. On July 12, Defendant called the victim twice, but he did not answer. On July 22, the victim called Defendant three times in a two-minute timespan, and the calls lasted less than one minute each.

On August 20, Defendant called the victim twice, but he did not answer. Immediately after, Defendant texted the victim, saying that he needed the money that day because his mother was stressed. The victim did not answer. On August 21, Defendant called the victim twice, but he did not answer. On August 22, Defendant called the victim, but he did not answer. Defendant sent a text message reading, "Say no more." On August 23, the victim texted Defendant, stating, "I get paid Friday. Call me or I call you when I get off." Defendant responded, "All right. Call me."

On August 27, Defendant texted the victim, "Don't forget to hit me up tomorrow when you get off. I [am] going to be at your crib if you forget to remind you." On August 28, Defendant texted the victim, asking what time he got off work "so I can come get them 50[.]" Defendant called the victim three times, but he did not answer. Immediately after, Defendant texted the victim, "Hey, Homie. Me and CM fixing to come see about that. You need to call me ASAP." The victim responded five minutes later, "I told you I was at

work and you can m[i]ss me with that side-talk s--t and homie don't [no] n---a scare me.  I told you when I get off I call you."  Defendant responded, "Ain't no n---a trying to scare you . . . .  What time you get off, though, so I can [be] ready?"  Later that evening, Defendant called the victim, but he did not answer.

On August 29, Defendant called the victim twice, but he did not answer.  Defendant texted the victim, "What's up with you?  At work or something?"  Defendant sent a second text, stating, "Say no more.  It's up there."  He then sent a coffin emoji.

On September 25, 2020, Defendant texted a person named Davion Gates, stating "Hey, fam, I got you 350 for the .357."  Detective Thomas stated that, in his experience, this referred to having $350 to purchase a .357 caliber firearm.  Detective Thomas said that the victim was killed using a .357 SIG.

On cross-examination, Detective Thomas acknowledged that he could not conclusively say that the victim was killed using a .357 SIG, but he maintained that the evidence was consistent with such a conclusion.  He stated that Mr. Gates did not respond to the text message and that his investigation did not reveal whether Defendant went through with the purchase.  Detective Thomas agreed that the .357 Glock magazine was recovered in co-defendant Lillard's kitchen.  Detective Thomas noted that police attempted to speak to Mr. Gates about this case but that he was uncooperative; at the time of trial, Mr. Gates had been shot and killed.

Detective Thomas testified that, after Defendant sent the coffin emoji to the victim, they had no further communication by cell phone.  Detective Thomas denied that the emoji could be interpreted as an instruction not to contact Defendant again because the victim was "dead to [Defendant.]"

Detective Thomas testified that the investigation revealed that the victim also owed another person $50 or $60, but this person was hospitalized at the time of the shooting.  Detective Thomas agreed that the victim had a "serious drug problem" and that co-defendant Lillard was known to the police before the shooting.

When asked about the scope of data that Detective Thomas was able to extract from Defendant's cell phone, he testified that, because they did not have the passcode, he could obtain most data except for some deleted files, including Defendant's copy of the text messages he exchanged with the victim.  Detective Thomas stated that, if Defendant had deleted messages from September 27 in which he arranged to buy marijuana, Detective Thomas "[v]ery likely" would have been able to recover them.  He noted that he recovered other deleted data "during that timeframe[.]"

Detective Thomas testified that he found messages on Defendant's phone related to other drug transactions. He opined that it was significant that Defendant deleted text messages with the victim "from nearly 30 days earlier[.]" Detective Thomas agreed that the victim initiated contact with Defendant and that the victim repeatedly reached out saying that he intended to settle the debt.

Detective Thomas testified that the gun used to kill the victim was never found. He added that, in his experience, guns used in homicides were quickly discarded.

Detective Thomas testified that, given Defendant's presence with co-defendant Lillard and co-defendant Lillard's messages with the victim, he found the idea that Defendant did not know he was accompanying co-defendant Lillard to a drug sale to be unreasonable. Detective Thomas acknowledged that, during Defendant's interview, he stated that he did not believe Defendant had "go[ne] there knowing[ly] and intentionally", but that his opinion changed after receiving all the cell phone data in the case.

Detective Thomas stated that, although he could not say that Defendant left co-defendant Lillard's house with the intent to kill the victim, his investigation indicated that Defendant formed an intent to kill at some point before the shooting. Detective Thomas opined that the victim was killed based upon the fact that "there was a debt," and he noted that drug dealers did not "like getting stiffed on their payments[.]"

On recross-examination, Detective Thomas acknowledged that the victim's money was left behind at the scene.

Upon this evidence, the jury convicted Defendant as charged, and the trial court imposed a mandatory life sentence in Count 1, first-degree premeditated murder.[5]

### C. Sentencing

At the sentencing hearing, Rutherford County Juvenile Court records for case numbers 80861, 82128, 80587, and 79696 were received as exhibits. Detective Thomas testified that case number 80861 arose from a July 11, 2019 incident in which a man was walking home from a gas station when "two young men held him up at gunpoint and robbed him of money." Detective Thomas noted that, according to the police report, the firearm used was a "snub[-]nosed revolver." Detective Thomas stated that Defendant was

---

[5] The judgment form in Count 1 was corrected twice; once to correct Defendant's personal information, and once to note that, as a minor convicted of first-degree murder, Defendant was entitled to a parole hearing on his life sentence after between twenty-five and thirty-six years of service. *See State v. Booker*, 656 S.W.3d 49, 66 (Tenn. 2022).

- 16 -

identified as a suspect using the gas station's surveillance cameras. Defendant pleaded guilty to aggravated robbery in Rutherford County Juvenile Court case number 80861 on August 20, 2019. Detective Thomas noted that Defendant's ankle monitor was related to case number 80861. The prosecutor noted for the trial court that Defendant also had a probation violation filed in case number 80861 in December 2020.

In case numbers 80587 and 79696, on August 20, 2019, Defendant pleaded guilty to two counts of simple possession of marijuana. In case number 82128, on December 8, 2020, Defendant pleaded guilty to theft of property valued at more than $2,500 but less than $10,000.

Detective Thomas testified that his search of Defendant's cell phone revealed "lots of language indicating narcotic sales" on multiple occasions, including sales made to the victim. He stated that the sales were "predominantly" of heroin. On cross-examination, Detective Thomas agreed that Defendant was sixteen and seventeen years old at the time of his juvenile court cases.

The presentence report was entered as an exhibit and reflected that Defendant told the presentence report officer that he had been sentenced to community service and six months in juvenile detention for simple possession of marijuana and aggravated robbery, respectively. Defendant reported that he had first consumed alcohol at age sixteen and began using illegal drugs, including marijuana and prescription medications, at age fourteen. Defendant stated that he had been diagnosed with attention deficit hyperactivity disorder and anxiety disorder, but he had never been hospitalized for these issues. Defendant graduated from an online high school and attended a drug treatment program while he was in DCS custody. Defendant's STRONG-R Assessment reflected that he was a high risk for violence.

Defendant provided a written statement of the offenses, in which he recounted that he went to co-defendant Lillard's house to get marijuana, but co-defendant Lillard did not have any. Defendant said that co-defendant Lillard told him that they could get marijuana "down the street" and that, to Defendant's knowledge, they were going to get marijuana, after which Defendant intended to go home and get ready for school the next morning. Defendant stated that he and co-defendant Lillard heard gunshots very close to their location and ran away. Defendant noted that they did not know if the gunshots were directed at them. Defendant stated that he was afraid and was not supposed to be "out," so he did not call 911 and got a ride home instead.

Relative to Defendant's age, the State argued that he had spent his formative years working to get to this point. He went from smoking marijuana, to selling drugs, to robbing people, to continuing to sell drugs, to then murdering somebody that owed him money.

- 17 -

This is . . . not a youthful offender whose young age kept him from understanding what's going on . . . . The fact that he's a juvenile doesn't always equate to, "I can never understand what I'm doing because I am just a juvenile." That's not what any of our cases have said.

. . . .

So these factors still apply . . . . I would submit to the [c]ourt, his history shows you his young age didn't slow him down. It didn't impact him. The only thing he did was get worse . . . . The older he was getting, the more violent he became.

The prosecutor noted for the trial court that Defendant's STRONG-R Assessment included that "Defendant obtained a disciplinary write-up for engaging in a group fight in July of 2024" and argued that Defendant was "still adding to his record of criminal activity."

Defense counsel argued that, pursuant to *State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), Defendant's youth should be considered as a mitigating factor and in the court's determination of consecutive sentencing.

The trial court discussed that *Booker*'s holding was limited to life sentences, although it acknowledged Defendant's assertion that consecutive sentencing might constitute an end run around *Booker*. Defense counsel responded that there was "a trickle down from *Booker* because of the language used . . . about sentencing juvenile transfers to adult court in general, and that it provides an avenue for Your Honor . . . to consider the age and mental temperament. . . of juveniles so as not to punish them the same as adults[.]"

The State argued that the sentencing hearing satisfied *Booker* because the trial court had discretion to consider Defendant's youth as a mitigating factor.

The trial court stated that it had considered the evidence presented at the pretrial proceedings, trial, and sentencing hearing; the presentence report, including the validated risk and needs assessment; the principles of sentencing; arguments made as to sentencing alternatives; the nature and characteristics of the criminal conduct; the parties' arguments as to enhancement and mitigating factors; statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses; Defendant's handwritten statement; and Defendant's potential for rehabilitation.

The trial court noted that it had already imposed a mandatory life sentence in Count 1 and that the sentencing hearing pertained to Counts 2, 3, and 4. The trial court found that Defendant was a Range I, standard offender. The court found, relative to Count 2,

- 18 -

employing a firearm during the attempt to commit a dangerous felony, that the statutory mandatory minimum sentence was six years, which was also the maximum in-range sentence for that offense. The trial court imposed the mandatory six-year sentence at 100% service.

The trial court continued to consider enhancement and mitigating factors only in regard to Counts 3 and 4. The trial court found that Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, including Defendant's prior delinquency adjudications in juvenile court; Detective Thomas' testimony about evidence of other heroin sales on Defendant's cell phone; and pretrial bond hearings in which the court received testimony about Defendant's repeated use of marijuana, which led to revocation of his bond. *See* Tenn. Code Ann. § 40-35-114(1). The trial court also found that the personal injuries to the victim were particularly great; that Defendant before trial or sentencing failed to comply with the conditions of a sentence involving release into the community, i.e., his juvenile court probation; that Defendant possessed or employed a firearm during the commission of the offenses, although the trial was "not placing great weight on it"; that Defendant was on probation when he committed the offenses; and that Defendant was adjudicated to have committed delinquent acts as a juvenile that would constitute felonies, including aggravated robbery and Class D felony theft. *See* Tenn. Code Ann. § 40-35-114(6), (8), (9), (13)(C), (16). The trial court placed "great weight" on Defendant's criminal history and Defendant's failure to comply with his previous probation.

The trial court applied as a mitigating factor that Defendant, because of youth, lacked substantial judgment in committing the offenses. *See* Tenn. Code Ann. § 40-35-113(6). The trial court acknowledged Tennessee and United States Supreme Court case law "relating to a child, a minor's lack of substantial judgment and lowered culpability because of the not yet fully developed brain of a child . . . . [T]hat factor applies, and the [c]ourt is required to take that into consideration here as to [Defendant's] culpability." The trial court continued:

> As it relates to attempt to sell a Schedule 1 controlled substance, conspiracy to sell a Schedule 1 controlled substance, in considering, again, this less[er] culpability of a child and how much weight to place on it, I think that the [S]tate has the argument . . . [that] as [Defendant] has increased in age, his criminal conduct has grown and grown consistently more violent. It has grown to some extent related to controlled substances a bit of a business. It has become more sophisticated. So the [c]ourt finds that the [S]tate has overcome that and shown that even though a reduction of his culpability based upon his age is required to be considered by the [c]ourt, they've overcome that substantially based upon all of the criminal conduct, criminal behavior, criminal convictions[.]

- 19 -

The trial court ordered six-year sentences in Counts 3 and 4. The trial court found that Defendant was not a suitable candidate for alternative sentencing.[6]

Relative to consecutive sentencing, the trial court found that the six-year sentence in Count 2 was statutorily mandated to be consecutive to Count 1. The trial court found that Defendant was on probation at the time of the offenses. *See* Tenn. Code Ann. § 40-35-115(b)(6). The trial court also found that Defendant was an offender whose record of criminal activity was extensive, noting his juvenile court adjudications for aggravated robbery, Class D felony theft, and two counts of simple possession of marijuana; the multiple heroin transactions documented on Defendant's cell phone; and Defendant's marijuana use during the pendency of this case. *See* Tenn. Code Ann. § 40-35-115(b)(2). The trial court found that the behavior and adjudications occurred in a "truncated period" and that the conduct "increased in violence and intensity over the course of [Defendant's] short life." The trial court noted that *Booker* "did not consider what a [c]ourt could or could not do in consecutive sentencing otherwise outside of the fact that the defendant is a juvenile." The trial court reiterated that, if it "need[ed] to look at [Defendant's] lowered culpability . . . the [S]tate has overcome that lower[ed] culpability," discussing that the offenses constituted "an increase in criminal activity" and the "culmination" of such activity. The trial court ordered that the sentences in Counts 3 and 4 run concurrently to one another but consecutively to Counts 1 and 2, for an effective sentence of life plus twelve years.

The trial court denied the motion for new trial, and Defendant timely appealed.

## II. Analysis

On appeal, Defendant contends that the evidence is insufficient to support his convictions; that the trial court erred by granting the State's motion in limine to exclude references to Defendant's age; and that the trial court failed to properly consider Defendant's age as a mitigating factor in sentencing.

### A.    *Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to support his convictions. Rather than taking issue with the individual elements of the offenses, Defendant argues generally that "there are simply too many holes left to fill" in the State's evidence that Defendant knew about the heroin transaction and participated in the offenses. Defendant avers that the State's theory of criminal responsibility "overlooked key pieces of information": that the victim only set up a drug deal with co-defendant Lillard; that there

---

[6] Defendant does not contest on appeal the trial court's denial of alternative sentencing.

was a lack of evidence that Defendant "encouraged the deal," helped co-defendant Lillard accomplish the deal, or "stood to share in [its] profits"; and that no evidence was presented that Defendant handled the drugs or arranged for their purchase. Defendant further avers that the coffin emoji he sent to the victim could have been interpreted as something other than a threat; that no evidence was presented that Defendant successfully purchased a .357 caliber firearm; and that his DNA was not found on the .357 Glock magazine found at co-defendant Lillard's house.

Defendant acknowledges that he was present with co-defendant Lillard before, during, and after the shooting but avers that "proximity alone is not enough to make [Defendant] criminally responsible for [co-defendant] Lillard's hatching a plan to sell drugs to [the victim], for [co-defendant] Lillard's attempting to sell drugs to [the victim], for a firearm being used as part of the drug sale, or for anything to do with [the victim]'s death." The State responds that the evidence was sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### 1. First-degree murder

Premeditated first-degree murder is, as charged in this case, "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). With respect to first-degree murder, a person acts intentionally "when it is the person's conscious objective or desire to cause the death of the alleged victim." *State v. Page*, 81 S.W.3d 781, 790 (Tenn. Crim. App. 2002); *see State v. Oeser*, No. M2019-01052-CCA-R3-CD, 2020 WL 7312174, at *7 (Tenn. Crim. App. Dec. 11, 2020), *perm. app. denied* (Tenn. Mar. 17, 2021).

Premeditation "is an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

"Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have long recognized that premeditation may be proved by circumstantial evidence . . . and may be inferred from the manner and circumstances of the killing[.]" *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (internal citations and quotation marks omitted). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

Our supreme court has discussed that "numerous specific circumstances . . . may bear on the existence of premeditation," including,

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). However, this "list of specific circumstances developed through Tennessee caselaw is not exhaustive," and the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)); *see Davidson*, 121 S.W.3d at 615; Tenn. Code Ann. § 39-13-202(e). "Ultimately, then, premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgment." *Reynolds*, 635 S.W.3d at 917 (internal citations and quotation marks omitted).

In the light most favorable to the State, the trial evidence established that Defendant had "fronted" drugs to the victim in June and July 2020. The victim periodically promised to pay, but Defendant's attempts to obtain payment were unsuccessful. On August 27, Defendant told the victim that he would come to the victim's house if the victim forgot to pay him. On August 28, Defendant stated that he and "CM," part of co-defendant Lillard's nickname, were "fixing to come see about that," meaning the money. The victim responded, "[Y]ou can m[i]ss me with that side-talk s--t and homie don't [no] n---a scare me." Defendant replied that no one was trying to scare him. After the victim did not respond to him on August 29, Defendant sent the victim text messages reading, "Say no more. It's up there" with a coffin emoji. Defendant did not communicate with the victim by cell phone after. Defendant reached out to Mr. Gates via text on September 22, stating that he had $350 with which to purchase a .357 firearm.

On the evening of September 27, Defendant texted co-defendant Lillard, his cousin, that he was coming over. Before Defendant arrived at co-defendant Lillard's house, co-defendant Lillard told Defendant that he had "something going." Co-defendant Lillard then exchanged text messages and voice calls with the victim to arrange a $50 heroin purchase. Co-defendant Lillard and Defendant were seen on multiple surveillance cameras bicycling to the shooting scene. Additionally, Defendant's ankle monitor tracked his location throughout the evening.

The victim was shot once in the chest with a .357 caliber bullet and died of his injuries. Surveillance cameras showed Defendant's and co-defendant Lillard's flight on foot after the shooting. Defendant's DNA was recovered from the bicycle found directly

behind the victim's body. A .357 caliber Glock magazine was later found in co-defendant Lillard's kitchen.

After the shooting, Defendant and co-defendant Lillard had a text conversation in which they discussed whether the police officers in the area were watching them and the house on Middleborough Court to which they had fled. Defendant remarked that "maybe they [were] trying to . . . throw us off" and that the police were not watching where they were. Co-defendant Lillard advised Defendant to "text nothing about it." Defendant described being "up like a MF" and stated that he would not be able to sleep without marijuana. Defendant subsequently accessed a news article about the shooting and deleted his text messages with the victim.

When Defendant was arrested and interviewed, he maintained that he and co-defendant Lillard were not involved in the shooting, although his account of events fundamentally changed as Detective Thomas revealed more information about the police investigation.

Defendant does not dispute his presence at the shooting on appeal. A rational jury could have found that Defendant intentionally shot the victim in the chest during the heroin sale, and the following factors supported a finding of premeditation: the use of a deadly weapon on an unarmed victim; Defendant's having threatened the victim with the coffin emoji; the procurement of a weapon; Defendant's motive of sending a message to others about the victim's unpaid debt; the lack of provocation on the part of the victim; and Defendant's failure to render aid to the victim.

Likewise, a rational jury could have found that, with the intent to promote or assist co-defendant Lillard, Defendant aided co-defendant Lillard to commit the murder. The victim was killed with a .357 caliber firearm, and a .357 Glock magazine was found in co-defendant Lillard's kitchen. Defendant was trying to purchase a .357 caliber firearm days before the shooting. Defendant was undisputedly present with co-defendant Lillard before, during, and after the shooting, and their messages reflect a close companionship. *See Phillips*, 76 S.W.3d at 9. Moreover, after the shooting, Defendant discussed the police presence with co-defendant Lillard and acknowledged that they should not text anyone else about what had happened.

The crux of Defendant's argument is that he was merely present during the attempted drug sale and shooting and that the State's evidence regarding Defendant's awareness of the heroin sale, the debt-related conflict with the victim, and Defendant's attempt to obtain a .357 caliber firearm from Mr. Gates was either not credible or should not have been given any weight. However, by its verdict, the jury credited the State's evidence, resolved any inconsistencies in the State's favor, and found that the weight of the evidence established Defendant's guilt beyond a reasonable doubt. *Bland*, 958 S.W.2d

at 659. We will not disturb those determinations on appeal. Defendant is not entitled to relief on this basis.

## 2. *Attempted sale of a Schedule I controlled substance*

It is a criminal offense for a person to knowingly sell a controlled substance; heroin is a Schedule I controlled substance. Tenn. Code Ann. § 39-17-406(c)(11), -417(a)(3). Criminal attempt is defined as, when a person "acting with the kind of culpability otherwise required for the offense[,] . . . [a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

The jury was also instructed on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant, in some way, knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

In the light most favorable to the State, the evidence at trial established that both Defendant and co-defendant Lillard sold heroin to the victim. On the night of the shooting, co-defendant Lillard told Defendant that he had "something going." After Defendant arrived at co-defendant Lillard's house, the victim texted co-defendant Lillard and arranged to buy $50 worth of heroin. Defendant accompanied co-defendant Lillard to the shooting scene, and police found $50 on the ground near the victim. The evidence was sufficient for a rational jury to find that co-defendant Lillard intended to sell the victim heroin, and his conduct of coming to the arranged meeting place was a substantial step toward committing the offense. In turn, the evidence was sufficient for a rational jury to find that

Defendant was criminally responsible for the attempted sale. Defendant was undisputedly present with co-defendant Lillard before, during, and after the shooting, and their messages reflect a close companionship. *See Phillips*, 76 S.W.3d at 9.

Again, we note that Defendant's argument regarding his knowledge of the attempted heroin sale goes to the weight and credibility of the evidence, not its sufficiency, and we will not disturb the jury's determinations on appeal. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this basis.

### 3. *Employing a firearm during the attempt to commit a dangerous felony*

Employing a firearm during the attempt to commit a dangerous felony is a criminal offense. Tenn. Code Ann. § 39-17-1324(b)(2) (2020). Attempted sale of a controlled substance is a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(L) (2020).

In the light most favorable to the State, as noted above, the evidence at trial sufficiently established that co-defendant Lillard attempted to sell heroin to the victim and that Defendant was criminally responsible for that conduct. Defendant contacted Mr. Gates two days before the shooting, stating that he had $350 for a .357 caliber firearm. The victim was shot by either Defendant or co-defendant Lillard using a .357 caliber firearm, and a .357 Glock magazine was found in co-defendant Lillard's kitchen. As stated above, Defendant was at a minimum criminally responsible for co-defendant Lillard's actions that night, but the circumstantial evidence was also sufficient for a rational jury to find that Defendant employed a firearm during the attempted heroin sale. Defendant is not entitled to relief on this basis.

### 4. *Conspiracy to sell a Schedule I controlled substance*

Conspiracy is committed when "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." Tenn. Code Ann. § 39-12-103(a) (2016). "No person may be convicted of conspiracy to commit an offense, unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d).

> Conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and

measures, other than silence, for concealing the crime or obstructing justice in relation to it.

Tenn. Code Ann. § 39-12-103(e)(1). "While the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, . . . the agreement need not be formal or expressed, and it may be proven by circumstantial evidence." *Pike*, 978 S.W.2d at 915 (internal citation omitted). To prove the existence of a conspiracy, the State must prove that a "mutual implied understanding" existed between the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993).

In the light most favorable to the State, the evidence at trial established that both Defendant and co-defendant Lillard sold heroin to the victim. On the night of the shooting, co-defendant Lillard told Defendant that he had "something going." After Defendant arrived at co-defendant Lillard's house, the victim texted co-defendant Lillard, and he arranged to buy $50 worth of heroin. As documented by the ankle monitor data and surveillance recordings, Defendant accompanied co-defendant Lillard to the sale and fled with him on foot after the shooting. This circumstantial evidence was sufficient to prove a "mutual implied understanding" between Defendant and co-defendant Lillard. *Id.* Defendant is not entitled to relief on this basis.

### B. Motion in Limine

Defendant contends that the trial court erred by granting the State's motion in limine regarding Defendant's age, arguing that his case is distinguishable from the only case the State cited in its motion, *State v. Taylor*, No. M2016-02578-CCA-R3-CD, 2018 WL 265512, *42-48 (Tenn. Crim. App. Jan. 3, 2018). In *Taylor*, the defendant helped rob the victim; the defendant was a female minor and had an ongoing sexual relationship with the adult male victim, but the robbery incident itself did not involve sex. *Id*. This court affirmed the trial court's decision to exclude evidence of the defendant's age, reasoning that information about the victim's wrongdoing could unfairly prejudice the jury against the victim.

The State responds that the trial court did not abuse its discretion because Defendant's age was not relevant to any material issue at trial.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 states that evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "To be relevant, evidence must tend to prove a material issue." *Id.*, Advisory Comm'n Cmts. "Our Rules of Evidence provide that relevant evidence is generally admissible while irrelevant evidence is not." *State v. Kiser*, 284 S.W.3d 227, 262 (Tenn. 2009); s*ee* Tenn. R. Evid. 402. However, even if the evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" Tenn. R. Evid. 403.

As a preliminary matter, Defendant also argues for the first time on appeal that "the court erred by not taking *Booker*'s logic into account while ruling on the State's motion[.]" He submits that evidence of his age was relevant to his ability to form the respective mental states required for each of the offenses and that the trial court prevented him from introducing "evidence of how his age could affect, for example, 'reflection and judgment' as set out in the premeditation [jury] instruction."

At the motion in limine hearing, which was the only substantive[7] discussion of this issue, defense counsel did not ask the trial court to consider *Booker* or argue that Defendant's age was relevant to the material issue of his mental state. Defense counsel only argued that there was no prejudicial effect because the jury could possibly "be more enraged" that a juvenile committed the offenses. Counsel candidly stated, "I don't know how this plays out or how I would bring this into the case."

---

[7] Defendant's motion for new trial stated without elaboration, "[The c]ourt erred by precluding defendant from being referred to child, kid, boy, juvenile, etc." At the motion for new trial hearing, defense counsel stated that he would "stand on the contents of the motion without further argument."

Defendant's argument appears to have been limited to Rule 403's balancing test and did not rely on Rule 401. Defendant may not fault the trial court for failing to apply legal reasoning to an evidentiary issue when he did not present it. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Moreover, "[i]t is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citation omitted). Accordingly, this issue has been waived. We briefly note that *Booker*, which we discuss in detail below, does not apply to evidentiary issues.

Regarding Rule 403's balancing test, we agree that the facts of *Taylor* are distinguishable; the prejudicial effect of Ms. Taylor's minor status in the context of her sexual relationship with the victim was clearly different than the risk of confusing the jury here. However, the fact that the case was not on point does not mean that the trial court's decision was baseless. The trial court considered the parties' arguments, found that Defendant's age was not relevant, and further found that the risk of confusing the jury substantially outweighed any minimal probative value. The trial court's decision to exclude references to Defendant's age was "a choice among acceptable alternatives," and we will not second-guess the trial court's discretionary decision. *McCaleb*, 582 S.W.3d at 186 (citation omitted).

Furthermore, Defendant "has not shown that the jury's verdict would have been different had the jury heard evidence of" his age. *State v. Shepherd*, No. W2024-01645-CCA-R3-CD, 2025 WL 2814798, at *6 (Tenn. Crim. App. Oct. 3, 2025), *no perm. app. filed*. The jury could plainly see in the police interview recording that Defendant was young at the time of the shooting, and the manner in which Defendant referenced going to school during the interview suggested that he was still in high school. The jury was able to consider that fact in rendering its verdict notwithstanding the absence of proof regarding Defendant's age. Defendant is not entitled to relief on this basis.

### C.    *Sentencing*

Defendant contends that the trial court did not properly consider his youth in "its use of factors that led to its sentencing determinations." Defendant acknowledges that the sentences in Counts 1 and 2 were mandated by statute, and his argument appears only to address Counts 3 and 4.

Relative to the sentence length, Defendant avers that the trial court abused its discretion by imposing maximum in-range sentences in Counts 3 and 4, arguing that "at least some mitigation of the sentence should have occurred based on the [c]ourt finding a mitigating factor in his favor."

Relative to the trial court's ordering partial consecutive sentences, Defendant urges this court to expand the holding in *Booker*, 656 S.W.3d 49, to any discretionary sentencing decision that "puts [the effective sentence] outside the twenty-five-to-thirty-six-year window prescribed by *Booker*."

The State responds that the trial court did not abuse its discretion by ordering maximum in-range sentences in Counts 3 and 4 or by imposing partial consecutive sentencing.

Tennessee Code Annotated section 40-35-210(b) requires that a trial court consider the following when determining a specific sentence to impose upon a defendant:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the [A]dministrative [O]ffice of the [C]ourts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications;

and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles" set out in Tennessee Code Annotated sections 40-35-102 and 103. *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Defendant concedes that the trial court's sentencing decision, which was within-range and imposed after the court announced its findings on the record, should be reviewed for an abuse of discretion with a presumption of reasonableness.

### 1. *Length of sentence*

In sentencing Defendant, the trial court noted that it had considered the applicable statutory scheme, the proof presented at trial and sentencing, and the presentence report. It found that Defendant had no prior convictions as an adult and, therefore, was a Range I offender. Attempt to commit and conspiracy to commit sale of a Schedule I controlled

substance are both Class C felonies. Tenn. Code Ann. §§ 39-12-101 (criminal attempt); -12-103 (conspiracy); -12-107(a), (c) (classification of attempt and conspiracy); -17-417(b) (sale of Schedule I controlled substances). A Range I sentence for a Class C felony is not less than three years nor more than six years. Tenn. Code Ann. § 40-35-112(a)(3).

The trial court found that six enhancement factors applied: that Defendant had engaged in criminal behavior in addition to that necessary to establish his range; that the personal injuries inflicted upon the victim were particularly great; that Defendant before trial failed to comply with the conditions of a sentence involving release into the community; that Defendant possessed or employed a firearm during the commission of the offenses; that Defendant was on probation at the time the offenses were committed; and that Defendant was adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult. Tenn. Code Ann. § 40-35-114(1), (6), (8), (9), (13)(C), (16). The trial court also applied one mitigating factor, that Defendant, because of youth, lacked substantial judgment in committing the offenses. Tenn. Code Ann. § 40-35-113(6). Weighing these factors, the court found that the appropriate sentence was six years' incarceration each for Counts 3 and 4.

The trial court properly exercised its discretion in imposing the within-range sentences. The court considered the applicable statutory scheme, the proof presented at trial and sentencing, and the presentence report. Defendant argues that the trial court should have applied more weight to the mitigating factor of his youth; however, we reiterate that the weight afforded to a mitigating factor is no longer a basis to reverse a sentence. *Bise*, 380 S.W.3d at 706. Because the sentence does not defy all logic and reason, no relief is warranted. *See State v. Kirkpatrick*, No. E2011-01091-CCA-R3-CD, 2013 WL 105896, at *11 (Tenn. Crim. App. Jan. 9, 2013) (noting that "micro-management of the trial court's sentencing decisions . . . is plainly no longer permissible under *Bise* and *Caudle*"), *perm. app. denied* (Tenn. June 12, 2013). Defendant is not entitled to relief on this basis.

### 2. Consecutive sentencing

In *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862 (citing Tenn. R. Crim. P. 32(c)(1)). Among the Tennessee Supreme Court's reasons for shifting to an abuse of discretion standard, the *Pollard* Court noted that "the 2005 amendments also signaled a general increase in the discretionary authority of the trial courts in regard to all sentencing decisions, including the decision of whether to impose consecutive sentences." *Id*. at 860.

If a defendant is convicted of more than one criminal offense, the court shall order sentences to run consecutively or concurrently. Tenn. Code Ann. § 40-35-115(a). Tennessee Code Annotated section 40-35-115(b) provides, in pertinent part:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (6) The defendant is sentenced for an offense committed while on probation[.]

Tenn. Code Ann. § 40-35-115(b)(2), (6). Any one of the grounds set out in Tennessee Code Annotated section 40-35-115(b) is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

In *Booker*, our supreme court held "that an automatic life sentence when imposed on a juvenile homicide offender with no consideration of the juvenile's age or other circumstances violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution." 656 S.W.3d at 52. The court reasoned that "in juvenile first-degree murder cases, *and only in these cases*, a sentence is automatically imposed without considering age, the nature of the crime, or any other factors." *Id.* at 63 (emphasis added).

Because consecutive sentencing was not mandated by statute or rule in Defendant's case, the trial court had broad discretion to consider mitigating factors, including Defendant's youth. *See* Tenn. Code Ann. § 40-35-113(6). A trial court also has the discretion to order sentences to be served concurrently even when the State proves one or more of the factors for consecutive sentencing set out in Tennessee Code Annotated section 40-35-115(b). *State v. Perry*, 656 S.W.3d 116, 125 (Tenn. 2022). There is no *automatic* consecutive sentencing under Tennessee Code Annotated section 40-35-115, and thus, the statute provides "the necessary procedural protection to guard against disproportionate sentencing." *Booker*, 656 S.W.3d at 63.

This court has declined to expand *Booker* to consecutive sentencing issues, holding that "the imposition of a consecutive sentence by a trial court who has the discretion to

consider 'age, the nature of the crime, or any other factors' provides 'the necessary procedural protection to guard against disproportionate sentencing'" and does not violate the Eighth Amendment. *Mallard v. State*, No. M2024-00265-CCA-R3-PC, 2024 WL 4904626, at *4 (Tenn. Crim. App. Nov. 27, 2024) (quoting *Booker*, 656 S.W.3d at 63), *perm. app. denied* (Tenn. Apr. 17, 2025); *see also Moore v. State*, No. M2024-00547-CCA-R3-PC, 2025 WL 362418, at *4 (Tenn. Crim. App. Feb. 3, 2025), *perm. app. denied* (Tenn. June 20, 2025). We similarly decline to do so here.

The trial court properly imposed partial consecutive sentences after finding that two factors existed in support of consecutive sentencing, neither of which Defendant disputes. Defendant is not entitled to relief on this basis.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE

- 34 -